■ SANDRA DELGADO et al., Respondents, v CITY OF NEW YORK et al., Appellants, et al., Defendants. [928 NYS2d 487]—

This is an action to recover compensatory and punitive damages for personal injuries and property damage arising from the execution of a "no-knock" search warrant at plaintiffs' apartment, 5E, at 1065 Manor Avenue in Bronx County on May 25, 1994, at or around 12:30 A.M. Because we conclude that the information furnished by the confidential informant in this case did not meet the two-prong test of reliability set forth in *Aguilar v Texas* (378 US 108 [1964]) and *Spinelli v United States* (393 US 410 [1969]), we modify as described below.

On the evening of May 18, 1994, an individual was arrested for possession of crack cocaine. The arresting officer was defendant Brian Washington. Washington's partner that day was Officer Robert Masiello.[1] On the following day, May 19, 1994, prior to the individual's arraignment in Criminal Court, this individual, identified only as "John/Jane Doe," agreed to furnish the officers with information concerning narcotics sale trafficking in the area of his arrest. At his examination before trial, Washington could not recall whether Doe was registered as a confidential informant, or whether any attempt was made to investigate his or her reliability. As the court below noted, the record is unclear as to whether this individual offered information as part of some cooperation agreement, whether he or she was ultimately convicted of anything, what his or her past criminal history may have been or anything else of substance concerning him or her. Nonetheless, defendant Nicholas Witkowich, then captain, approved the application for the warrant.

The sum and substance of the information provided by Doe was that he or she had received the drugs in question from a skinny five-foot eight-inch male Hispanic, approximately 20 years of age, referred to only as "Green Eyes," in an apartment at 1065 Manor Avenue in the Bronx. Doe did not furnish the apartment number of the building at 1065 Manor Avenue where

---

1. James Masiello, not Robert Masiello, is named as a defendant herein. As discussed below, we dismiss the complaint as against him.

"Green Eyes" could be found. Rather, he or she told Masiello and Washington that "Green Eyes' " apartment was the first one on the left after exiting the elevator on the fifth floor and turning left. He or she further stated that the door to the apartment was brown, and that the windows of the apartment faced the rear of the building. Doe did not indicate that there were stickers on the door of the apartment. Doe described the other occupants of the apartment as a female Hispanic called "Shorty" and a small female infant. Doe specified that no dogs were present and that "Green Eyes" possessed two guns, a 9 millimeter handgun and a Tech 9 semiautomatic. Doe told the police that "Green Eyes" sold drugs from the apartment from midnight to 8:00 A.M.

The record does not indicate that the officers conducted an investigation to corroborate the information provided by Doe prior to seeking a search warrant. The officers did not conduct surveillance of the subject apartment, did not attempt to supervise the informant or to make controlled buys from the apartment, or even try to confirm the identity of the apartment's occupants by speaking to the superintendent or other residents of the building. Washington testified that he did not know of any evidence that would corroborate what the informant had told him concerning drug dealing from the subject premises.

Based on the information provided by Doe, Officer Robert Masiello sought a warrant from Criminal Court to search the specific apartment premises at 1065 Manor Avenue described by Doe. The officer's affidavit stated, "I am informed by a confidential informant [CI], who is known to me, but whose name is omitted to preserve his/her confidentiality, that on other occasions he/she has been inside the apartment on the fifth floor of 1065 Manor Avenue, Bronx, New York for the purpose of obtaining red top vials of crack/cocaine to sell on the street. I am further informed by the CI that to get to the apartment you enter 1065 Manor Avenue and take the elevator to the fifth floor exit elevator to the left and the apartment is the first apartment on left, a brown door. CI further informs me that he/she was last inside the apartment on May 18th, at approximately midnight for the purpose of receiving 1 row of vials to sell on the street where each row consists of 25 vials of red top crack/cocaine and each vial sells for $5.00. CI further informs me that while inside the apartment 'Green Eyes' a male hispanic light skinned approximately 5'8" tall, skinny took out a brown bag from the bedroom and went to the kitchen and removed a row of vials and CI observed approximately an additional 6-7 rows of vials. CI further informs me that while he/she was inside the

apartment 'Green Eyes' went in the bedroom in the apartment and came out and on the kitchen table placed a 9 millimeter automatic tech 9 semi-automatic machine pistol [sic]. Deponent further states that said informant's reliability is supported by this statement against penal interest as well as the strict detail and description with which said informant articulates his/her observations."

On May 19, 1994, at 4:50 P.M., a justice of the Supreme Court, Bronx County, granted the application for the no-knock warrant. The warrant was valid for a period of 10 days and gave the police authority to enter the apartment without first announcing their presence based upon the allegations in the moving affidavit that the drugs were easily disposable and the alleged presence of two guns in the apartment. The warrant authorized a search for narcotics and firearms, to be exercised "at all hours" within the next 10 days, at the premises described as "the apartment [ ]on the fifth floor, to get to the apartment take the elevator to the 5th floor, exist [sic] elevator, make left and the apartment is the first apartment on the left, brown door." The issuing court expressly found that adequate grounds existed for authorizing any executing officer to enter the subject premises without giving notice of his authority or purpose.

On March 19, 1994, Washington conducted a check to ensure that no other law enforcement agency had an active investigation on the 5th floor of the premises. The results were negative, neither confirming nor calling into question the reliability of Doe's information.

On May 20, 1994, Sergeant Tennant went to 1065 Manor Avenue and confirmed that the "[apartment] on the 5th floor is marked 5E it's a brown door," and also remarked upon the presence of "old stickers on the door." These stickers, it should be noted, were not described by Doe, despite their prominence on the door as evident in the photographs in the record. On May 24, 1994, a check was made to see if there was a telephone listing for apartment 5E, with no records found.

The warrant was executed by a team of about 12 armed officers of the Housing Police (then a branch of NYCHA) at about 12:50 A.M. on May 25, 1994 at apartment 5E. Plaintiff Sandra Delgado and her six children, ranging in age from 9 to 17 years old, were sleeping in their two-bedroom apartment when the officers battered down the door and entered the apartment. Plaintiffs testified that they hit the floor, face down, upon the command of the officers. Juan, the eldest child (then age 17), was pushed from behind by two officers and taken to the ground, where guns were put to his head. Gregory (then 15),

face down on the floor, had a gun held to his head until officers could handcuff him, and was informed that he was under arrest. At no time was plaintiff mother shown the warrant. Plaintiff mother and all but the two youngest children were handcuffed and all of them, with the exception of the youngest child, were held in the hallway outside the apartment for three hours while the officers searched the apartment, overturning furniture, slashing sofas and mattresses, and destroying property in the bedrooms including the children's posters and baseball cards.

Plaintiff mother was brought to the fourth floor of the building and questioned concerning the presence of drugs or guns on the premises. When plaintiff mother replied in the negative, officers informed her that if they found drugs or guns she would "lose [her] kids." Several of the children were questioned regarding the presence of drugs and guns in the apartment. The children testified that officers told their mother, in their presence, that if they found any crack bottles, the children would be going to a foster home. Candida (then age 11) heard officers say she could be taken away from her mother and "started crying." At the end of the search, finding no drugs or weapons on the premises, the police left.

Plaintiffs testified that subsequent to the search they suffered emotional trauma. Plaintiff mother testified that she had trouble sleeping for two years after the incident and that she still suffered from depression and periodic nightmares. Enrique (then 13) testified that he had trouble sleeping and was able to sleep only "three, four hours" nightly. Juan testified that his asthma worsened after the search and that he also suffered from sleep disturbances. Plaintiffs Gregory and Candida felt sufficiently unsafe that they slept away from the apartment for some period of time after the incident. Candida testified that she had nightmares and difficulty studying; Enrique (then age 13) testified that he could not walk down the streets because he feared the police were "watching" him.

Plaintiffs brought actions against the various defendants, later consolidated, alleging, inter alia, false arrest, unlawful imprisonment, negligence, assault and battery, and violations of 42 USC § 1983.

Defendants moved for summary judgment on the ground that they were protected by qualified immunity when executing a valid search warrant. The motion court granted summary judgment in favor of the individual officers who entered the apartment in reliance on the facially valid warrant, but denied the motions of defendant Witkowich, the captain in charge of the

investigation and search, and defendants Washington and Masiello. The court concluded that the justice who had issued the warrant had no independent basis upon which to make a quantitative or qualitative analysis of the information before him as to the reliability of the informant or of the information he or she provided, and thus, that the search warrant was not properly issued and the search conducted pursuant thereto was invalid.

It is elementary that no warrant shall issue except on probable cause. New York Courts apply the two-prong *Aguilar-Spinelli* test in evaluating the hearsay information provided by an undisclosed informant (*see Aguilar v Texas*, 378 US 108 [1964]; *Spinelli v United States*, 393 US 410 [1969]). The application for a search warrant must demonstrate to the issuing magistrate both (1) the veracity or reliability of the informant, and (2) the basis of the informant's knowledge. "[T]he magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, was 'credible' or his information 'reliable' " (*Aguilar*, 378 US at 114 [citation omitted]).

The reliability dimension requires a showing either that the informant is credible or, in the absence of such a showing, that the specific information given is credible (*People v DiFalco*, 80 NY2d 693, 696-697 [1993]). Factors to consider in evaluating reliability include whether the informant has supplied accurate information to the police in the past, whether the informant's statements were made under oath, whether the informant has made an admission against penal interest, or whether the details of the informant's story have been corroborated by the police (*see People v Calise*, 256 AD2d 64, 65 [1998], *lv denied* 93 NY2d 851 [1999]). In analyzing this component, corroboration means "the traditional sort of independent corroboration by the police in checking out the truth of the informant's tip through information obtained from a source *other than the informant's statement*" (*DiFalco*, 80 NY2d at 698).

The basis of knowledge component is distinct from the veracity component and must be independently satisfied; this dimension requires that the information provided by the informant be corroborated or confirmed through details sufficient in number and suggestive of, or directly related to, the criminal activity informed about (*see People v Elwell*, 50 NY2d 231, 234 [1980]). In a proper case, the specificity and accumulation or quality of detail may "corroborate" or "self-verify" the basis for the

informant's knowledge by showing that the informant must have obtained the information from firsthand observation of that activity (*id.* at 241-242).

We find that the police did not have sufficient independent verification to satisfy the veracity component of *Aguilar-Spinelli,* nor did they possess the requisite knowledge necessary to satisfy the basis of knowledge component of the test. The police had no basis to believe that the confidential informant was reliable—indeed, he or she had never before provided information leading to an arrest (*compare People v Hanlon,* 36 NY2d 549, 558 [1975] [finding that an affidavit established the reliability of an informer where the informer stated that he had purchased narcotics from defendant, there had been a previous communication of accurate information, and there was corroborative verification by the police]; *People v Salcedo,* 309 AD2d 542, 543 [2003], *lv denied* 1 NY3d 634 [2004] [the informant's veracity was established where, inter alia, two other informants with histories of providing accurate information corroborated information of a third informant, and the information provided by all three informants was corroborated by independent police investigation]; *People v Stroman,* 293 AD2d 350 [2002], *lv denied* 98 NY2d 702 [2002] [informant's veracity was established by a declaration against penal interest together with corroboration from a source other than the informant's statement]).

Plaintiffs' expert, Henry Branche, a retired sergeant in the police force, averred that pursuant to standard procedures, confidential informants may not be utilized before they are properly registered and approved. In an emergency (which this was not, given that six days elapsed between issuance and execution of the warrant), a confidential informant may be utilized provided permission is obtained from a commanding officer. Branche noted that where a prospective confidential informant is the defendant in an active criminal case, permission for registration must first be obtained from the assistant district attorney.

Defendants assert that the informant's statements were against penal interest, and therefore, reliable. On this record, however, we cannot state that the informant's statements were sufficiently contrary to his or her penal interest so as to establish reliability under the first prong of *Aguilar-Spinelli* (*see People v Burks,* 134 AD2d 604, 605 [2d Dept 1987] [the informant's statement that he had, on unspecified past occasions, purchased cocaine from the defendant, was not sufficiently against penal interest to establish reliability]). According to the affidavit in support of the search warrant, Doe

informed that "on other occasions" he or she had been inside the premises for the purpose of obtaining red top vials from "Green Eyes" to sell on the street, and that on one occasion, May 18th, he or she had purchased one row of vials to sell on the street. It is not clear, on this record, that this statement, admitting possession of small quantities with intent to sell them on the street, was likely to be used against Doe.

Even if it could be said that the first prong of *Aguilar-Spinelli* was satisfied by the alleged statement against penal interest, no corroborative verification whatsoever was performed by the police prior to issuance of the warrant. The only confirmation of information provided by the informant occurred subsequent to the issuance of the warrant, and that investigation consisted solely of verifying that no landline was associated with the apartment, and that the apartment in fact had a brown door and was located to the left as one exited the elevator. The police also ascertained that no other agency had the premises under investigation. This information, as noted by the lower court, was entirely unhelpful in establishing the informant's reliability or the reliability of his information, even assuming that the corroboration occurred prior to the issuance of the warrant. Furthermore, the fact that the officer dispatched to the apartment noted the presence of prominent stickers on the door, which had not been described by Doe, should have raised questions about the reliability of the information.

The second dimension of *Aguilar-Spinelli*, the informant's basis of knowledge, was never established by corroborative details of such quantity and quality as to be indicative of criminality (*see Elwell*, 50 NY2d at 234-235). Indeed, the only attempt to determine whether criminal activity was afoot was to ascertain whether other law enforcement agencies were conducting investigations of the same premises, the results of which, as noted above, were negative, neither proving nor disproving anything. The police failed to inquire concerning the occupants of the subject apartment, failed to speak to the building superintendent, failed to conduct surveillance of the apartment, made no attempt to conduct controlled buys from the apartment, and otherwise failed to corroborate the information supplied by Doe.

It was on the basis of this criminal's information—an informant with no track record, no proven reliability and whose information concerning drug trafficking on the premises was not even minimally corroborated—that approximately 12 members of the NYCHA Police Department crashed through the door of plaintiffs' apartment in the middle of the night, ter-

rified a mother and six children, held them for hours while they searched their apartment, destroying their property and threatening plaintiff mother that they would put her children in foster care if she did not tell the truth about the presence of drugs or guns in the apartment.

The individual defendants argue that they are entitled to dismissal of the charges against them because they enjoy a qualified immunity when executing a facially valid search warrant. "A government official performing a discretionary function is entitled to qualified immunity provided his or her conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" (*Liu v New York City Police Dept.*, 216 AD2d 67, 68 [1995], *lv denied* 87 NY2d 802 [1995], *cert denied* 517 US 1167 [1996]). To be entitled to qualified immunity, it must be established that it was objectively reasonable for the police officer involved to believe that his or her conduct was appropriate under the circumstances, or that officers of reasonable competence could disagree as to whether his or her conduct was proper (*see Simpkin v City of Troy*, 224 AD2d 897, 898 [1996]).

The lower court properly determined that only those police officers or other government agents who executed the no-knock warrant are entitled to qualified immunity. The officers who executed the warrant did so with the understanding that a valid search warrant had been issued. However, the same cannot be said for defendants Witkowich and Washington, who initiated the issuance of the search warrant and did little, if anything, to establish the reliability of the confidential informant or the information supplied by him or her (*see Rossi v City of Amsterdam*, 274 AD2d 874, 877 [2000] [where the officers executed a no-knock warrant at the wrong premises, albeit premises identified in the warrant, the court found that the officers who had conducted the investigation, applied for the no-knock warrant, supplied the description of the premises and supervised execution of the warrant were not entitled to summary judgment on the basis of qualified immunity]).

We are further disquieted by the manner in which the search warrant was executed. Upon entering the apartment, the police encountered not "Green Eyes" and "Shorty" with an infant, as described by the informant, but plaintiff mother and her six sleeping children. At that point, a reasonable police officer should have realized that an error had been made (*cf. Maryland v Garrison*, 480 US 79, 88 [1987]). "Qualified immunity does not provide a safe harbor for police to remain in a residence after they are aware that they have entered

the wrong residence by mistake. A decision by law enforcement officers to remain in a residence after they realize they are in the wrong house crosses the line between a reasonable mistake and affirmative misconduct" (*Simmons v City of Paris, Tex.*, 378 F3d 476, 481 [5th Cir 2004]). We note that while the informant identified the occupants of the apartment as "Green Eyes," "Shorty" and an infant, the warrant itself merely identifies the premises to be searched and not the occupants. Thus, it does not appear that the officers executing the warrant were aware of the error.

As to the section 1983 claim, a person has a private right of action under 42 USC § 1983 against police officers who, acting under color of law, violate federal constitutional or statutory rights. A complaint alleging gratuitous or excessive use of force by a police officer states a cause of action under the statute against that officer (*see Hodges v Stanley*, 712 F2d 34, 35 [2d Cir 1983]).

Captain Witkowich argues that the section 1983 claim should be dismissed as to him. We disagree. Although the captain was not present at the execution of the warrant, he was directly in charge of and authorized the operation. Indeed, the official police report of the execution of the warrant states: "Entry to the location was made at 0150 hours by members of the Bronx Narcotics Enforcement Unit under the direction and supervision of Captain NICHOLAS WITKOWICH."

The section 1983 claim, however, should be dismissed as against defendant NYCHA. Plaintiffs have not demonstrated that any custom or official policy of NYCHA caused the claimed violation of their constitutional rights (*see Rossi*, 274 AD2d at 878).[2]

We grant the motion of defendant James Masiello to dismiss the complaint as to him. Robert Masiello, not James Masiello, was the officer who submitted the affidavit in support of the search warrant. Thus, James Masiello is not the proper party. Concur—Mazzarelli, J.P., Friedman, Catterson and Manzanet-Daniels, JJ.

---

2. To the extent the officers executing the warrant were acting within the scope of their employment, the negligent hiring claim against NYCHA is not viable (*see Karoon v New York City Tr. Auth.*, 241 AD2d 323, 324 [1997]).