Valdez v City of New York (2024 NY Slip Op 06589)

Valdez v City of New York

2024 NY Slip Op 06589

Decided on December 24, 2024

Appellate Division, Second Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on December 24, 2024
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

VALERIE BRATHWAITE NELSON, J.P.
CHERYL E. CHAMBERS
LILLIAN WAN
CARL J. LANDICINO, JJ.

2022-04980
 (Index No. 508295/17)

[*1]Maria Valdez, etc., appellant, 
v
City of New York, et al., respondents, et al., defendants.

David A. Zelman (Rickner PLLC, New York, NY [Sara Wolkensdorfer and Rob Rickner], of counsel), for appellant.
Muriel Goode-Trufant, Corporation Counsel, New York, NY (Jane L. Gordon and Chase Henry Mechanick of counsel), for respondents.

DECISION & ORDER
In an action, inter alia, to recover damages for false arrest and unlawful search, the plaintiff appeals from an order of the Supreme Court, Kings County (Consuelo Mallafre Melendez, J.), dated June 6, 2022. The order, insofar as appealed from, granted those branches of the motion of the defendants City of New York and Andrew Kamna which were for summary judgment dismissing the causes of action to recover damages for false arrest, unlawful search, and failure to intervene insofar as asserted against the defendant Andrew Kamna and the cause of action alleging vicarious liability against the defendant City of New York under a theory of respondeat superior, and denied the plaintiff's cross-motion for summary judgment on the causes of action to recover damages for false arrest and unlawful search insofar as asserted against the defendant Andrew Kamna.
ORDERED that the appeal from so much of the order as granted those branches of the motion of the defendants City of New York and Andrew Kamna which were for summary judgment dismissing the cause of action to recover damages for failure to intervene insofar as asserted against the defendant Andrew Kamna and the cause of action alleging vicarious liability against the defendant City of New York under a theory of respondeat superior is dismissed, as the plaintiff is not aggrieved by those portions of the order (see CPLR 5511; Mixon v TBV, Inc., 76 AD3d 144); and it is further,
ORDERED that the order is affirmed insofar as reviewed; and it is further,
ORDERED that one bill of costs is awarded to the defendants City of New York and Andrew Kamna.
This action arises from the execution of a search warrant by New York City Police Department officers, during which the officers searched the plaintiff's apartment and temporarily detained the plaintiff and her infant daughter, A. S. The warrant was issued by a magistrate based upon information obtained from a confidential informant, who had provided credible information in the past. Additionally, the confidential informant appeared before the magistrate and, thus, was available for questioning. According to deposition testimony, the confidential informant stated that three days before the search, he had been "hanging out" at the apartment with a certain individual [*2]named in the warrant, J. M., and had personally observed J. M., who was 19 years old, in possession of a loaded firearm and an additional magazine for the firearm. While executing the search warrant, the officers did not encounter J. M. and did not recover a firearm. During the search, the plaintiff told the defendant Andrew Kamna, the officer who obtained the search warrant, that she did not know J. M. and that J. M. no longer lived at the apartment, but his mail was still being delivered there. After speaking to the plaintiff, Kamna came to believe that J. M. did not live at that address. The plaintiff alleged that after her conversation with Kamna, the officers continued their search of the apartment, which lasted a total of approximately two to three hours.
Notably, on this appeal, the plaintiff is not challenging the propriety of the magistrate's initial determination to issue the warrant, nor is she challenging the constitutionality of the search when it commenced, including, inter alia, law enforcement's initial entry into the apartment (cf. Delgado v City of New York, 86 AD3d 502, 508-510). Instead, the plaintiff contends that the probable cause initially supporting the warrant was "vitiated" midsearch, when Kamna was told by the plaintiff that J. M. no longer lived at the apartment that was the target of the search.
Given the limited scope of the plaintiff's contentions, many of the facts cited by our dissenting colleague are not relevant to our determination of this appeal. This appeal does not present an opportunity to review the circumstances under which a warrant may issue upon information from a confidential informant. Moreover, while the warrant at issue here was a no-knock warrant, this case does not allow us to express an opinion on whether no-knock warrants should be limited or banned. Consequently, the timing and manner of the entry into the apartment by Emergency Service Unit (hereinafter ESU) officers, their method of restraining the plaintiff's male companion when they first entered, and whether the plaintiff was dressed or able to immediately tend to her child at the time of law enforcement's entry are not relevant to the issues the plaintiff has asked this Court to decide.
The plaintiff, individually and as mother and natural guardian of A. S., asserted, among other things, causes of action to recover damages for false arrest, unlawful search, and failure to intervene, and a cause of action alleging vicarious liability against the defendant City of New York under a theory of respondeat superior. The City and Kamna (hereinafter together the defendants) moved, inter alia, for summary judgment dismissing the causes of action to recover damages for false arrest, unlawful search, and failure to intervene insofar as asserted against Kamna and the cause of action alleging vicarious liability against the City under a theory of respondeat superior. The defendants contended, among other things, that there was probable cause to search the plaintiff's apartment and to detain the plaintiff and A. S., and that Kamna's actions were protected by the doctrine of qualified immunity. The plaintiff cross-moved for summary judgment on the causes of action to recover damages for false arrest and unlawful search insofar as asserted against Kamna and opposed those branches of the defendants' motion which were for summary judgment dismissing those causes of action insofar as asserted against Kamna. The plaintiff contended, inter alia, that her and A. S.'s Fourth Amendment rights were violated when the search was not immediately terminated after Kamna realized that J. M. did not live at the apartment.
In an order dated June 6, 2022, the Supreme Court, among other things, granted those branches of the defendants' motion which were for summary judgment dismissing the causes of action to recover damages for false arrest, unlawful search, and failure to intervene insofar as asserted against Kamna and the cause of action alleging vicarious liability against the City under a theory of respondeat superior, and denied the plaintiff's cross-motion. The plaintiff appeals.
The appeal from so much of the order as granted those branches of the defendants' motion which were for summary judgment dismissing the cause of action to recover damages for failure to intervene insofar as asserted against Kamna and the cause of action alleging vicarious liability against the City under a theory of respondeat superior must be dismissed. As the plaintiff did not oppose those branches of the defendants' motion, the plaintiff is not aggrieved by so much of the order as granted those branches of the motion (see CPLR 5511; Birmingham v Linden Plaza Hous. Co., 210 AD3d 853, 854; Mixon v TBV, Inc., 76 AD3d 144, 156-157).
A defendant may demonstrate his or her entitlement to summary judgment dismissing a cause of action alleging unlawful search by demonstrating that the "circumstances presented to the police permitted a lawful search of the plaintiff" (Braxton v City of New York, 178 AD3d 1000, 1002). "Ordinarily, a[ ] . . . search pursuant to a warrant issued by a neutral magistrate is presumed reasonable because such warrants may issue only upon a showing of probable cause" (Walczyk v Rio, 496 F3d 139, 155-156 [2d Cir]; see People v Castillo, 80 NY2d 578, 585; People v Calise, 256 AD2d 64, 65). "To determine whether probable cause to search exists, an issuing magistrate must 'make a practical, common-sense decision whether, given all the circumstances set forth in [an] affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place'" (United States v Jones, 43 F4th 94, 109 [2d Cir], quoting Illinois v Gates, 462 US 213, 238; see People v Bigelow, 66 NY2d 417, 423).
A plaintiff seeking to recover damages for false arrest must establish, inter alia, that his or her confinement was not privileged (see Broughton v State of New York, 37 NY2d 451, 456-457). "[A] detention during the execution of a facially-valid search warrant is constitutionally permissible" and, therefore, privileged (Lee v City of New York, 272 AD2d 586, 586), as "'[a] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted'" (Linson v City of New York, 98 AD3d 1002, 1003, quoting Michigan v Summers, 452 US 692, 705).
Here, the defendants demonstrated, prima facie, that the search of the plaintiff's apartment and the detention of the plaintiff and A. S. during that search were conducted pursuant to a valid search warrant and were lawful (see Lee v City of New York, 272 AD2d at 586-587).
In opposition, the plaintiff failed to raise a triable issue of fact. The issue presented by the plaintiff is a narrow one: whether law enforcement's continued search of the plaintiff's apartment became unconstitutional due to information Kamna obtained in the middle of the search. The parties offered differing accounts of how long the search took and at what point during the search the conversation between Kamna and the plaintiff occurred.
Kamna testified at his deposition that a team of ESU officers entered the apartment first, while he waited outside the apartment in the hallway for approximately "[f]ive to ten minutes" until he was "given the confirmation that it was all clear inside." When he entered, he saw three civilians: an adult female, an adult male, and a 10-year-old child. Kamna realized J. M. was not present when he did not see J. M. upon entering the apartment. A search was conducted after Kamna entered the apartment. When asked how long the search took, Kamna estimated "30 minutes," "approximately 30 minutes or more," and "about half an hour to an hour." Kamna explained to the occupants of the apartment "why [the officers] were there; that . . . [the officers] had a search warrant for the apartment due to an investigation that [they] had been conducting." According to Kamna, the occupants "were understanding of why [the officers] were there. They had said that [J. M.] didn't live there anymore. [The plaintiff] said that . . . she was still getting his mail to that location, and that was . . . really the extent of it, of the conversation." When asked whether the conversation happened "towards the beginning of when [he went] in," Kamna responded, "I went in, they  I believe we moved the adult male and female and the child to the living room area and cuffed the male individual and explained to them what was going on. So, it was maybe a little bit after we had first entered." During his deposition, Kamna admitted that he apologized to the occupants for the "inconvenience," but he denied that a mistake had been made. He further admitted that "[a]t some point" while in the apartment, he "realize[d] that that was not the residence of [J. M.]," and that he came to this realization "after speaking with [the plaintiff] and explain[ing] the situation and her explaining that [J. M.] hasn't lived there for however long, realizing that this wasn't his apartment." After this conversation, Kamna "did believe that [J. M.] didn't live there." Kamna initially agreed that this conversation occurred "about five minutes" or "ten" minutes after he had entered the apartment. Later in his deposition, Kamna testified that he did not recall whether his conversation with the plaintiff was toward the beginning or the end of the search. Based upon the information that the plaintiff had provided, Kamna "decided to use discretion in [his] search" and decided that he "wasn't going to do a full-on search of the location." During his deposition, Kamna agreed that he "apologized when [he] left because [he] went in there with the assumption that [J. M.] did reside [*3]there, but learned during the execution of the warrant that [J. M.] didn't."
The plaintiff testified at a hearing pursuant to General Municipal Law § 50-h and at her deposition that initially three or four officers entered her apartment in "SWAT uniforms." They ordered her to return to her bedroom, where they handcuffed A. S.'s father, who was in the same bedroom. When the plaintiff asked the officers why they were there and "why they [were] doing that," they responded that she would "have to wait until they finish." Officers searched the plaintiff's bedroom, including closets, dressers, the windows, and under the bed. They did not tell her what they were searching for. They required her to remain in her bedroom for "about five minutes" or "less than ten minutes" before she was permitted to go to A. S.'s bedroom. A. S. sat on her bed while officers "[were] in there going through her drawers and closet[,] asking [the plaintiff and A. S.] do [they] know where a gun is at." The plaintiff told the officers that she "didn't know what they were talking about." She testified that the officers did not give her any further information as to why they were there and "just told [her] to wait until they finished looking and then they'll explain everything once they finished." The plaintiff testified that she was in A. S.'s bedroom for "like ten minutes" or "about ten to fifteen minutes," and during that time, officers continued searching the plaintiff's bedroom and detaining A. S.'s father in that bedroom. The plaintiff further testified that "once everything was cleared [the officers] made all of [the occupants] come in the living room and sit on the couch as [the officers] searched [the] living room." The officers searched the living room by "[g]oing under the couch, the little compartments they had, the closet," as well as "the kitchen, the kitchen cabinets." The officers searched the living room and kitchen for "like fifteen minutes." At this time, the plaintiff and A. S. still "wonder[ed] . . . why [the officers were] there and what [the officers were] looking for because at that point [the plaintiff and A. S.] still didn't know [anything]." The plaintiff further testified that at one point, the officers asked for the occupants' identification, "to see if the person [the officers] were looking for was one of [the occupants]," but the officers did not explain what they were looking for until "[a]fter the fact." When asked what she meant by "after the fact," the plaintiff testified, "After everything that happened and they didn't find anything, that's when they felt, I guess bad and they were conversating with us and they told us, you know, we were looking for this person." The officers "apologized" because they "didn't . . . find anything," and "at that point," the plaintiff "asked them . . . why they [were] there." The officers told her that they were looking for J. M., "stating that he had a firearm." The plaintiff recognized the name because she would "get a lot of mail from that family." According to the plaintiff, the officers showed her a search warrant "after everything was done" and after the officers had already "searched the whole apartment and had [the occupants] sitting in the living room." The search warrant reflected that the officers "had a warrant for that apartment for [J. M.] for a firearm." The plaintiff testified that she told the officers that the person they were looking for did not live there, but they responded, "It didn't matter." According to the pleadings and the plaintiff's testimony, officers were in her apartment a total of either two hours, two and a half hours, or two and a half to three hours.
A. S. testified at her deposition that she awoke and entered the hallway of the apartment when law enforcement first arrived, and she stood in the hallway for an unspecified time. When the plaintiff was given permission to enter the A. S.'s bedroom, A. S. walked back into her bedroom with the plaintiff and sat on her bed. Within "probably . . . five seconds after [A. S.] sat on [her] bed," one of the officers asked A. S. and the plaintiff a question "about the person they were looking for," J. M., and A. S. and the plaintiff told the officer "that he doesn't live there." A. S. told the officer that she did not know J. M. Then "the other officer came and they were looking," said that "they were looking for a gun," and were "searching through [A. S.'s] clothes" and "searching [her] drawers to see if they [could] find a gun." The officers searched her bedroom for "probably . . . seven minutes," while she and the plaintiff watched. A. S. and the plaintiff then exited A. S.'s bedroom and walked past the plaintiff's bedroom, where A. S. saw another officer speaking to her father, who was handcuffed. A. S., her father, and the plaintiff were then led into the living room, where they all sat down on the couch, her father's handcuffs were removed, and officers expressed that "they were sorry for breaking into the house because they thought [the occupants] were the people that used to live there before." The occupants sat on the living room couch for "probably . . . an hour," during which time officers "were . . . apologizing" and "checking [A. S.'s] dad's closet as well." According to A. S., the officers were in the apartment for a total of "about two hours."
While our dissenting colleague interprets the testimony of the plaintiff and A. S. as reflecting that the ESU officers searched the apartment, the record indicates that the ESU officers performed only the initial entry and security sweep of the apartment, and regular uniformed police officers performed the actual search. When the plaintiff was asked about the number of officers who were in the apartment during the living room search, she estimated "six or seven," testifying, in part, that "the first [officers] that broke into the house, they left[,] and officers came" wearing a "different uniform." A. S. similarly testified that the officers searching her bedroom were "wearing regular police uniforms" and not "SWAT gear." A report completed by an ESU officer reflects that the ESU officers entered the apartment at 6:20 a.m. and had completed their assignment by 6:55 a.m. Our dissenting colleague interprets this record to mean that the ESU officers were "in the apartment" for "35 minutes." Assuming this is the case, the ESU report also states that "AT NO TIME DID TEAM SEARCH OR RECOVER EVIDENCE FROM WITHIN SEARCH WARRANT LOCATION."
We also cannot agree with the our dissenting colleague's characterization of Kamna's deposition testimony as him having "admitted" that the apartment he searched "was not the apartment described by the [confidential informant]." Nor can we agree with our dissenting colleague that the record supports an inference that Kamna engaged in a "general search" of the plaintiff's apartment simply "to see whether he might find anything else" after he "realized that this was not the apartment described by the [confidential informant]." The parties' testimony reflects that the apartment being searched was, in fact, the apartment described by the confidential informant, as confirmed by the plaintiff's description of receiving mail addressed to J. M. at the apartment. Nor does the record reflect that it was "apparent" to Kamna "that a young girl and her mother resided there, and there was no bedroom belonging to a 19-year-old male." The plaintiff does not contend that the layout or condition of the apartment should have alerted Kamna that J. M. did not live there. In any event, nothing in the record reflects that the physical conditions of the apartment when Kamna entered differed from what he had anticipated. Kamna testified only that he was aware that "there was at least one bedroom" in the apartment, and the confidential informant did not provide Kamna with a description or layout of the apartment. The record reflects that as the search unfolded, Kamna was confronted by two seemingly inconsistent sets of assertions by two interested witnesses. On the one hand, a previously reliable paid confidential informant stated that he had seen J. M. in this specific apartment within the past few days, and this information was partially corroborated by the current occupant's acknowledgment that J. M. used to live there. On the other hand, the current occupant denied that J. M. still lived there. The record reflects that Kamna's belief that J. M. did not live at the plaintiff's apartment developed gradually over the course of the search.
Notwithstanding the witnesses' differing accounts of the timeline of the search, it is undisputed that the conversation between Kamna and the plaintiff occurred after the ESU officers had completed their entry and initial security sweep of the apartment. The portion of the search and detention that the plaintiff contends was constitutionally impermissible consisted of the officers looking through dresser drawers, under the couch, in kitchen cabinets, and in a closet. The plaintiff and A. S. were not physically injured, they were not handcuffed, and the home was not "ransack[ed]" (Edwards v City of Mount Vernon, 46 Misc 3d 435, 438 [Sup Ct, Westchester County]). To the contrary, the plaintiff testified that after the search, the apartment "was clean . . . , it was fine, it was just a little messy, but not torn like . . . they didn't have a care and threw everything around." She also testified that in the living room there was personal property, such as clothes, that was "[a] little all over the place but not destroyed." A. S. testified that officers searched her dresser drawers by "lifting the clothes like they weren't throwing it. They were just lifting it to see if they find anything." Neither the plaintiff nor A. S. were held at gunpoint or verbally threatened (cf. Delgado v City of New York, 86 AD3d at 505-506), they were not strip-searched (cf. Green v City of Mount Vernon, 96 F Supp 3d 263, 289-290 [SD NY]), and they were not detained beyond the search itself for purposes of interrogation (cf. e.g. Ganwich v Knapp, 319 F3d 1115, 1121-1125 [9th Cir]). The plaintiff testified that the officers "apologized" and were "being polite," "weren't deranged or anything," and "were polite when they left."
In support of her contention that the probable cause supporting an otherwise valid search warrant may be vitiated by information obtained midsearch, the plaintiff relies upon cases involving the execution of a search warrant at a residence other than one described in the warrant [*4](see Maryland v Garrison, 480 US 79, 81; Simmons v City of Paris, Tex., 378 F3d 476, 478-480 [5th Cir]; Pray v City of Sandusky, 49 F3d 1154, 1159 [6th Cir]; Velardi v Walsh, 40 F3d 569, 575-576 [2d Cir]). These cases are factually inapposite to the case at bar.
In Maryland v Garrison, a search warrant authorized a search of the "third floor apartment" of a certain address, based upon the belief that the third floor contained only one apartment, occupied by the person who was the subject of the search warrant (Maryland v Garrison, 480 US at 80 [internal quotation marks omitted]). Only after executing the warrant did the officers realize that the third floor also included a separate apartment occupied by a second person who was not the intended target of the search (see id. at 81). The United States Supreme Court concluded that the officers' "execution of the warrant reasonably included the entire third floor," because "[p]rior to the officers' discovery of the factual mistake, they perceived [the subject's] apartment and the third-floor premises as one and the same" (id. at 88). The Court stated in dicta that "as the officers recognized, they were required to discontinue the search of [the second person's] apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant" (id. at 87).
Similarly, in Simmons v City of Paris, Tex. (378 F3d at 478-480), the officers executed a search warrant at a location other than the one described in the warrant due to the failure to confirm the house number before entering the premises. Pray v City of Sandusky (49 F3d at 1159) involved officers mistakenly executing a search warrant at the wrong half of a duplex. Velardi v Walsh (40 F3d at 575-576) involved officers executing a search warrant at a location that was mistakenly believed to match the physical description in the warrant but ultimately proved to be the house next door.
The present circumstances differ materially from these cases involving mistakes in the execution of search warrants at incorrect addresses. When a warrant is executed at an address that differs from the intended target location, the search is, for all practical purposes, a warrantless search (see Maryland v Garrison, 480 US at 82-83; Pray v City of Sandusky, 49 F3d at 1158-1159; Velardi v Walsh, 40 F3d at 575). Put another way, the execution of a warrant at an incorrect address results in searching a premises for which no magistrate has ever made a probable cause determination. Under such circumstances, the officers' continued search of such a premises after realizing their mistake is unreasonable. Here, by contrast, a neutral magistrate determined that there was probable cause to search the plaintiff's apartment based upon information supplied by Kamna and the confidential informant.
We fully agree with our dissenting colleague that the question of whether a validly issued warrant was executed in a reasonable manner is separate and distinct from the question of whether the warrant should have issued in the first instance (see e.g. Maryland v Garrison, 480 US at 84). Here, however, the plaintiff's arguments and the case law she cites do not support a determination that the manner of the search was unreasonable. The plaintiff's objection to Kamna's search is not with the manner of the warrant's execution per se, but with the fact that Kamna continued executing the warrant at all. The plaintiff contends that once Kamna knew or should have known that the basis of probable cause and the search warrant was invalid, he was obligated to stop the search. The plaintiff's allegation of officer error relates directly to the officer's purported failure to reassess the magistrate's underlying initial probable cause determination.
To credit the plaintiff's contention would require an unprecedented expansion of the appellate case law she cites. The mistake at issue in Maryland v Garrison and its progeny occurred in "executing" the search warrant at the wrong address (id. at 87), whereas the alleged mistake at issue here occurred in evaluating the reliability of the confidential informant. The plaintiff would require an officer to continually revisit and second-guess a magistrate's assessment of a confidential informant's credibility, in the middle of a search, based upon the changing circumstances as they evolve. Such a mandate would undermine the judicial independence that is the driving rationale behind the warrant requirement. "The purpose of a warrant is to allow a neutral judicial officer to assess whether the police have probable cause to make an arrest or conduct a search" (Steagald v [*5]United States, 451 US 204, 212). "[T]he placement of this checkpoint between the Government and the citizen implicitly acknowledges that an 'officer engaged in the often competitive enterprise of ferreting out crime' may lack sufficient objectivity to weigh correctly the strength of the evidence supporting the contemplated action against the individual's interests in protecting his [or her] own liberty and the privacy of his [or her] home" (id., quoting Johnson v United States, 333 US 10, 14 [citation omitted]).
With respect to the trial-level decisions cited by the plaintiff (see Edwards v City of Mount Vernon, 46 Misc 3d 435; Green v City of Mount Vernon, 96 F Supp 3d at 289-290), to the extent they support the plaintiff's position, they are unpersuasive, as they too rely upon an overbroad expansion of cases involving execution of warrants at incorrect addresses (see Maryland v Garrison, 480 US at 81; Pray v City of Sandusky, 49 F3d at 1159).
Even assuming, without deciding, that such midsearch vitiation of probable cause during a warrant-based search might be possible, under the present circumstances, Kamna retained probable cause to complete the search despite the plaintiff's statements that the subject no longer lived at the apartment, because the issuance of the warrant to search for a firearm at the apartment was not predicated solely upon the subject actually residing at the location where his criminal activity was reportedly observed (see Blight v City of Manteca, 944 F3d 1061, 1067 [9th Cir]). The confidential informant, who had given reliable information in the past, told Kamna that J. M. had been in possession of a firearm while "hanging out" with the confidential informant in the apartment just days prior. While Kamna was told midsearch that J. M. did not live at the apartment being searched, the confidential informant's tip still could have been true. Probable cause is "a standard well short of absolute certainty," and sometimes "[v]alid warrants will issue to search the innocent, and people like [the plaintiff and A. S.] unfortunately bear the cost" (Los Angeles County v Rettele, 550 US 609, 615). While "the resulting frustration, embarrassment, and humiliation may be real, . . . [w]hen officers execute a valid warrant and act in a reasonable manner to protect themselves from harm, . . . the Fourth Amendment is not violated" (id. at 615-616).
Moreover, in any event, Kamna is shielded from liability by the doctrine of qualified immunity under both state and federal law, as his actions in completing the search were not taken in bad faith or without a reasonable basis (see Arteaga v State of New York, 72 NY2d 212, 216), and did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known" (Pearson v Callahan, 555 US 223, 231 [internal quotation marks omitted]; see Jones v City of New York, 206 AD3d 635, 639). For a right to be clearly established, there must be "existing precedent" that places the constitutional question "beyond debate" (Ashcroft v al-Kidd, 563 US 731, 741). Qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law'" (id. at 743, quoting Malley v Briggs, 475 US 335, 335). While the "intrusion into this family's home" was "no doubt a terrifying and unfortunate experience," and the family had "neither committed, nor were suspected of, any wrongdoing[,] . . . their blamelessness is not the standard by which the officers' conduct is measured" (Lewis v City of Mount Vernon, 984 F Supp 748, 756 [SD NY]). Given the plaintiff's inability to cite any case clearly establishing that the probable cause originally supporting the warranted search was vitiated midsearch, it was not "objectively unreasonable" for Kamna to believe that "the continuance of the search would not violate the Fourth Amendment rights of the occupants" (id.).
Accordingly, the Supreme Court properly granted those branches of the defendants' motion which were for summary judgment dismissing the causes of action to recover damages for false arrest and unlawful search insofar as asserted against Kamna, and properly denied the plaintiff's cross-motion for summary judgment on those causes of action insofar as asserted against Kamna.
CHAMBERS, WAN and LANDICINO, JJ., concur.
BRATHWAITE NELSON, J.P., dissents in part and concurs in part, and votes to dismiss the appeal from so much of the order as granted those branches of the motion of the defendants City of New York and Andrew Kamna which were for summary judgment dismissing the cause of action to recover damages for failure to intervene insofar as asserted against the [*6]defendant Andrew Kamna and the cause of action alleging vicarious liability against the defendant City of New York under a theory of respondeat superior, as the plaintiff is not aggrieved by those portions of the order (see CPLR 5511; Mixon v TBV, Inc., 76 AD3d 144), modify the order, on the law, by deleting the provision thereof granting those branches of the motion of the defendants City of New York and Andrew Kamna which were for summary judgment dismissing the causes of action alleging unreasonable search and seizure insofar as asserted against the defendant Andrew Kamna, and substituting therefor a provision denying those branches of the motion, and, as so modified, affirm the order insofar as reviewed, with the following memorandum:
In the early morning hours of November 8, 2016, as the plaintiff and her infant daughter, A. S., were sleeping in their apartment, located in a New York City Housing Authority development in the Bedford-Stuyvesant neighborhood of Brooklyn, police officers in full tactical gear broke down the door without knocking or otherwise announcing their presence, detained the plaintiff and A. S. at gunpoint, and searched their home pursuant to a no-knock search warrant that was based upon faulty information from a confidential informant (hereinafter CI). The CI told the defendant Andrew Kamna, a New York City police officer, that J. M., a 19-year-old male, lived at the apartment and that three days earlier J. M. had been in possession of a loaded 9 millimeter firearm and magazine in his bedroom—information that turned out to be false. J. M., in fact, had not lived in that apartment for years, and the plaintiff and A. S. had never met him. Kamna obtained the search warrant based upon the false information from the CI. Viewing the evidence in the light most favorable to the plaintiff, prior to searching the apartment, Kamna realized or reasonably should have realized that the information from the CI was false. He nonetheless decided to search the apartment in order to see what he might find. My colleagues in the panel majority find that such a search is constitutionally permissible. I cannot agree and therefore respectfully dissent in part.
In November 2016, Kamna received a telephone call from the CI, who was interested in providing information in exchange for money. For such payment, the CI claimed that on November 5, 2016, he was "hanging out inside of the . . . bedroom" of J. M., a 19-year-old male, and saw J. M. in possession of a loaded black 9 millimeter firearm and an additional magazine for the firearm. The CI said that he had been in J. M.'s apartment on several occasions in the past and identified the plaintiff's apartment as that apartment. It is undisputed that in November 2016, the plaintiff was leasing the apartment. She lived there for two years with her daughter, A.S., who was 10 or 11 years old at the time of the search. J. M. apparently had lived in the apartment before the plaintiff, and she would sometimes receive his mail, but she had never met him. Based upon the CI's claims, Kamna obtained a no-knock search warrant to search the plaintiff's home for J. M., the firearm, and the ammunition. The warrant expressly was issued based upon Kamna's affidavit.
In the early morning of November 8, 2016, A. S. was asleep in her bedroom, and the plaintiff was asleep in her own bedroom with A. S.'s father Christopher Selby, who was approximately 35 years old. At 6:00 a.m., eight members of the Emergency Service Unit (hereinafter ESU) assembled to assist Kamna in the execution of the search warrant. The members of the ESU were dressed in full tactical gear and carried pistols, rifles, and submachine guns, among other things. At approximately 6:20 a.m., without first knocking on the door or otherwise announcing their presence, the members of the ESU forced their way into the apartment with weapons drawn, utilizing "HEAVY WEAPONS, BALLISTIC PROTECTION, AND ENTRY TOOLS," including a metal bar to break open the door.
The plaintiff was awoken by the loud noise, "jumped up out of [her] sleep," and ran toward the living room to find the cause of the noise. At the hallway, she saw flashlights, guns, and bulletproof vests. She was directed to return to her bedroom, and she complied. Members of the ESU, who had not identified themselves as police, came into the bedroom and grabbed Selby, threw him to the floor, put a gun to his head, told him that if he moved they would shoot him, and handcuffed him. A. S. also was awoken from her sleep by the sound of the apartment door being broken in. She saw a lot of flashlights, heard someone tell her father to get onto the floor and, "Don't move or I will shoot you," and saw her father being held on the floor. The plaintiff was wearing only a T-shirt and thong underwear. She was uncomfortable amongst the men who had forced their way into the apartment and asked to put on some clothes, but her request was denied, [*7]and she was prevented from covering her body. The plaintiff also was prevented from going to A. S.'s bedroom to check on the child.
The plaintiff was scared and asked the ESU members why they were there, but they would not tell her. As the ESU members searched through the apartment, the plaintiff kept pleading to be able to go to A. S., and after some time, the plaintiff was allowed to go to the child, but the plaintiff's repeated requests to be allowed to put on clothing were denied. During this time, Selby continued to be held at gunpoint on the floor. At some point, the plaintiff grabbed a pair of A. S.'s pants and put them on to cover herself.
According to the plaintiff and A. S., the ESU members searched the apartment, including closets, dressers, windows, under the beds, and through A. S.'s clothes. They then moved the plaintiff, Selby, and A. S. to the living room, and Selby was still handcuffed. According to the plaintiff, the ESU members then searched the living room and the kitchen for some time. According to ESU reports, the members of that unit were in the apartment for approximately 35 minutes. Kamna, who was waiting outside of the apartment while the ESU members secured it, testified at his deposition that ESU's job was to secure the apartment, not search it. Kamna testified that the search of the apartment was not conducted until after ESU left and Kamna and his team entered.
As soon as he entered the apartment, Kamna realized that J. M. was not in the apartment. Further, within 5 to 10 minutes, the plaintiff told Kamna that J. M. had not lived in the apartment for some time, and Kamna realized at that time that this was not J. M.'s apartment and believed that J. M. did not live there. Despite these realizations, Kamna testified that he believed that the warrant allowed him to search the apartment and he "decided to use discretion" and thereafter conduct what he described as a less than "full-on" search. According to Kamna, that search lasted approximately 30 minutes "or more." According to the plaintiff and A. S., police officers were in the apartment for approximately two to three hours. The plaintiff, A. S., and Selby were detained throughout the search, and Selby remained handcuffed until Kamna left the apartment. During the search of the apartment, officers discovered a marijuana cigar or cigarette, but no firearm or ammunition. The plaintiff and A. S. subsequently moved out of the apartment because they no longer felt safe there.
The plaintiff, individually and as mother and natural guardian of A. S., commenced this action, among other things, to recover damages for the violation of the plaintiff's and A. S.'s constitutional rights from the unreasonable search of the apartment and seizure of their persons during the search. The defendant City of New York and Kamna (hereinafter together the defendants) moved, inter alia, for summary judgment dismissing the complaint insofar as asserted against them. The plaintiff cross-moved for summary judgment on the causes of action alleging unreasonable search and seizure insofar as asserted against Kamna. The Supreme Court granted the defendants' motion and denied the plaintiff's cross-motion. On appeal, the plaintiff contends, among other things, that the court erred in denying her cross-motion and in granting those branches of the defendants' motion which were for summary judgment dismissing the causes of action alleging unreasonable search and seizure insofar as asserted against Kamna. Because the evidence submitted by the defendants on their motion failed to establish, prima facie, that Kamna's search of the apartment and the continued detention of the plaintiff and A. S. was reasonable and privileged, the court should have denied those branches of the defendants' motion which were for summary judgment dismissing the causes of action alleging unreasonable search and seizure insofar as asserted against Kamna.
Both the Fourth Amendment to the United States Constitution and article I, § 12 of the New York Constitution prohibit "unreasonable searches and seizures." As the text of both Constitutions makes clear, the ultimate standard by which to evaluate a search or seizure is reasonableness (see Riley v California, 573 US 373, 381). A search conducted pursuant to a warrant issued by a neutral and detached magistrate upon a finding of probable cause is presumptively reasonable (see United States v Lauria, 70 F4th 106, 120 [2d Cir]; Ganek v Leibowitz, 874 F3d 73, 81 [2d Cir]). "Nonetheless, . . . the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into . . . reasonableness" [*8](Messerschmidt v Millender, 565 US 535, 547). The United States Supreme Court has recognized that officers are obligated to discontinue a search as soon as they are "put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant" (Maryland v Garrison, 480 US 79, 87). Consistent with this finding, courts have recognized that the reasonableness of a search flowing from a search warrant ceases when officers know or should know that they have made a mistake in the execution of the search warrant (see Simmons v City of Paris, Tex., 378 F3d 476 [5th Cir]; Pray v City of Sandusky, 49 F3d 1154, 1159 [6th Cir]) or that the home should not have been included in the search warrant, e.g., because the information from a CI was not accurate (see Delgado v City of New York, 86 AD3d 502, 510-511; Edwards v City of Mount Vernon, 46 Misc 3d 435, 447-448 [Sup Ct, Westchester County]; Green v City of Mount Vernon, 96 F Supp 3d 263, 289-290 [SD NY]). When an officer realizes such an infirmity, the officer is "required to discontinue the search" (Maryland v Garrison, 480 US at 87; see Delgado v City of New York, 86 AD3d at 510-511; Edwards v City of Mount Vernon, 46 Misc 3d at 448; Simmons v City of Paris, Tex., 378 F3d at 479; Pray v City of Sandusky, 49 F3d at 1159; Green v City of Mount Vernon, 96 F Supp 3d at 289-290).
On appeal, the plaintiff has abandoned her challenge to the search warrant itself and has narrowed the unreasonable search and seizure causes of action to the search of the apartment and the detention of the plaintiff and A. S. that occurred after Kamna entered the apartment and realized that J. M. did not live there. The panel majority confuses the issue of whether a warrant should issue in the first instance with the evaluation of the reasonableness of the police conduct in the execution of the warrant. These are "two separate constitutional issues, one concerning the validity of the warrant and the other concerning the reasonableness of the manner in which it was executed" (Maryland v Garrison, 480 US at 84). "Those items of evidence that emerge after the warrant is issued have no bearing on whether or not a warrant was validly issued" (id. at 85). Correspondingly, in evaluating the reasonableness of the manner in which the warrant is executed, the court "must judge the constitutionality of [an officer's] conduct in light of the information available to [her or him] at the time [the officer] acted" (id.).
Here, Kamna sought out and obtained the warrant to search the plaintiff's apartment for J. M. and the weapon and ammunition based upon the CI's statement that just three days earlier he had seen J. M. in his bedroom in the apartment in possession of a firearm and magazine. Undisputedly, the CI either gave erroneous information regarding the location of J. M.'s apartment or gave false information. At his deposition, Kamna admitted that upon entering the apartment, he immediately realized that J. M. was not there, and that within 5 to 10 minutes, he realized that this was not J. M.'s apartment—i.e., it was not the apartment described by the CI. Per the plaintiff and A. S., the ESU members already had ransacked the apartment at this point, going through the dressers and closets of the bedrooms, it was apparent that a young girl and her mother resided there, and there was no bedroom belonging to a 19-year-old male. Viewing the evidence in the light most favorable to the plaintiff, at that point, a reasonable officer in Kamna's position would have known or should have known that he or she was in the wrong apartment or that the information the CI provided was false and the search of the apartment and the detention of the plaintiff and A. S. was no longer constitutional (see Green v City of Mount Vernon, 96 F Supp 3d at 289).
Viewed in the light most favorable to the plaintiff, the evidence showed that after having realized that this was not the apartment described by the CI, Kamna nonetheless decided to search the apartment in order to see whether he might find anything else. This general search returned a small amount of contraband unrelated to the search warrant. The rights of the people to be free from unreasonable searches and seizures is fundamental to our Federal and State Constitutions (see US Const, 4th Amend; NY Const, art I, § 12). The Fourth Amendment to the United States Constitution was adopted specifically to put an end to the practice of issuing general writs of assistance that would empower an officer to conduct a search merely in the hopes of discovering incriminating evidence (see Messerschmidt v Millender, 565 US at 560 [Sotomayor, J., dissenting]; Boyd v United States, 116 US 616, 625). Viewed in the light most favorable to the plaintiff on the defendants' motion (see Bazdaric v Almah Partners LLC, 41 NY3d 310, 316), the evidence was sufficient for a trier of fact to conclude that Kamna engaged in such a prohibited search.
Contrary to the determination of the panel majority, the issuance of the warrant to search for a firearm at the residence was predicated on the fact that the residence belonged to J. M. The warrant was issued based upon Kamna's affidavit, which in turn was based upon the CI's statements that he had seen J. M. in possession of a firearm and magazine in J. M.'s bedroom. Markedly, the CI stated that he had seen J. M. in possession of the items, not that J. M. stored them in the apartment. Further, there was no general allegation regarding criminal activity at the apartment (cf. Blight v City of Manteca, 944 F3d 1061, 1067 [9th Cir] [mobile home allegedly inhabited by individual to help with an illegal marijuana operation on 4.26-acre rural property was reasonably included within the search warrant]). Once it became apparent that the apartment was not the one described by the CI, Kamna was "required to discontinue the search" (Maryland v Garrison, 480 US at 87).
I also disagree with the panel majority that the defendants established, as a matter of law, that Kamna was protected by qualified immunity. As discussed above, viewing the evidence in the light most favorable to the plaintiff, the trier of fact could find that Kamna knew or reasonably should have known that he was in the wrong residence or that the CI provided false information. Courts have recognized "the clearly established constitutional rule that, when law enforcement officers are executing a search warrant and discover that they have entered the wrong residence, they should immediately terminate their search," and qualified immunity does not "provide a safe harbor for police to remain in a residence" after they have realized the mistake (Simmons v City of Paris, Tex., 378 F3d at 479-481). Viewing the facts in the light most favorable to the plaintiff, at the point that Kamna realized or reasonably should have realized that this was the wrong apartment—i.e., that there either was a mistake in the location or the CI provided false information—his actions were no longer shielded by immunity (see Maryland v Garrison, 480 US at 87; Green v City of Mount Vernon, 96 F Supp 3d at 289-290; Edwards v City of Mount Vernon, 46 Misc 3d at 448).
Lastly, the panel majority is of the view that the timing and manner of the ESU members' entry into the apartment, their method of restraining A. S.'s father, the continued denials of the plaintiff's requests to put on clothing, and the manner in which the plaintiff was prevented from going to A. S.'s bedroom to check on the child are not relevant to the issues that the plaintiff is asking this Court to decide. Under the circumstances of this appeal, I am of the view that all of these issues are relevant, as the record on appeal clearly fails to establish that Kamna's search of the apartment and continued detention of the plaintiff and A. S. was reasonable and privileged.
Additionally, I note that given the state of concern in New York and other jurisdictions about the expanded use of no-knock warrants and proposed legislation to restrict such use (see e.g. 2023 NY Senate Bill S4820, 2023 NY Assembly Bill A4369; City of Buffalo, Executive Order 2020-002), courts must not remain silent in the face of such clear violations of the Fourth Amendment.
Contrary to the plaintiff's contention, on her cross-motion for summary judgment, she failed to establish her prima facie entitlement to judgment as a matter of law on these same causes of action insofar as asserted against Kamna. Accordingly, I would modify the order so as to deny those branches of the defendants' motion which were for summary judgment dismissing the causes of action alleging unreasonable search and seizure insofar as asserted against Kamna.
ENTER:
Darrell M. Joseph
Clerk of the Court